IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

MARCUS RAY JOHNSON,

    Petitioner,

VS.

WILLIAM TERRY, Warden,

    Respondent.

CIVIL ACTION NO.: 1:06-CV-84 (WLS)

## ORDER

Pending before the Court is Petitioner's Motion for Leave to Conduct Discovery and for Authorization and Payment of Necessary Expert and Investigative Services. After careful consideration of the record, the briefs of the parties, and the relevant case law, the Court **DENIES** Petitioner's Motion.

### I. BACKGROUND

A. FACTS

The historical facts concerning this case were set forth as follows by the Supreme Court of Georgia:

> The evidence adduced at trial shows that the victim, Angela Sizemore, met Johnson in a west Albany bar called Fundamentals between 12:30 and 1:30 a.m. on March 24, 1994. Ms. Sizemore had been to a memorial service for an acquaintance the previous day, and she had been drinking so heavily the bar had stopped serving her. Johnson was wearing a black leather jacket, jeans, black biker boots, and a distinctive turquoise ring. According to a witness, Johnson was angry and frustrated because another woman had spurned his advances earlier in the evening. The bar owner and its security officer (who both personally knew Johnson) testified that they saw Johnson and Ms. Sizemore kissing and behaving amorously. Johnson and Ms. Sizemore left Fundamentals together; the bartender handed Ms. Sizemore's car keys directly to Johnson. They were seen walking towards Sixteenth Avenue.

At approximately 8:00 a.m. on March 24, 1994, a man walking his dog found Ms. Sizemore's white Suburban parked behind an apartment complex in east Albany, on the other side of town from Fundamentals. Ms. Sizemore's body was lying across the front passenger seat. She had been cut and stabbed 41 times with a small, dull knife, and she had bruises and marks from being hit and dragged. The fatal wounds were six stab wounds to the heart. The medical examiner also discovered that a foreign object had been inserted into the victim's vagina and anus; the object had ruptured the wall of the vagina and lacerated the rectum. He testified that she was alive during the stabbing and genital mutilation.

Four people testified that they saw Johnson about an hour before the body was found. Two witnesses testified that they saw him walk from the area where the victim's Suburban was parked through an apartment complex to a bus stop. He boarded a bus and asked if the bus would take him to the Monkey Palace (a bar where Johnson worked) in west Albany. Three witnesses, including the bus driver, identified Johnson as being on the bus (one of the witnesses who saw Johnson walk through the apartment complex boarded the same bus as he did). Two witnesses stated that their attention was drawn to Johnson because that area of Albany is predominantly African-American, and it was extremely unusual to see a Caucasian there at that time of day. All the witnesses testified that Johnson's clothes were soiled with dirt or a substance they had assumed to be red clay. The witnesses gave similar descriptions of his clothing; in court, two witnesses who sat near Johnson on the bus identified his jacket, boots and distinctive turquoise ring.

The police determined that Ms. Sizemore was murdered in a vacant lot near Sixteenth Avenue in west Albany. Present in the lot were bloodstains, scuff marks, drag marks, and a pecan branch with blood and tissue on one end. The medical examiner testified that this branch was consistent with the object used to mutilate the victim's vagina. The vacant lot is about two blocks from Fundamentals and about half a block from the house where Johnson lived with his mother.

A friend of Johnson testified that after he called her early on March 24, she picked him up at his house at 9:30 a.m. and took him to her home, where he slept on her couch for several hours. Johnson then told her he wanted to take a bus to Tennessee and that he needed her to go to the Monkey Palace to pick up some money he was owed. At his request, she dropped him off near a church while she went to get the money. The police were waiting for Johnson to show up, and they returned with the friend and arrested Johnson. Before they told him why they were arresting him, he blurted, "I'm Marcus Ray Johnson. I'm the person you're looking for."

DNA testing revealed the presence of the victim's blood on Johnson's leather jacket. Johnson had a pocketknife that was consistent with the knife wounds on the victim's body. He had scratches on his hands, arms, and neck. In a statement, Johnson said he and the victim had sex in the vacant lot and he "kind of lost it." According to

Johnson, the victim became angry because he did not want to "snuggle" after sex and he punched her in the face. He stated he "hit her hard" and then walked away, and he does not remember anything else until he woke up after daybreak in his front yard. He said, "I didn't kill her intentionally if I did kill her."

In the sentencing phase, the State presented evidence that Johnson assaulted a 76-year-old jailer during an escape attempt by striking the jailer a glancing blow in the head with a gun butt. The blow "peeled back" part of the jailer's scalp; the wound required 21 staples to close. The medical doctor who treated the jailer opined that based on the amount of force required to inflict the wound, had the blow directly hit the jailer, it would have crushed his skull and he probably would not have survived.

***Johnson v. State***, 271 Ga. 375, 375-77 (1999).

B. PROCEDURAL HISTORY

Petitioner was arrested on March 24, 1994. On April 5, 1998, a jury convicted Petitioner of malice murder, felony murder, aggravated assault, rape, and aggravated battery. *Id.* at 375. On April 7, 1998, the jury recommended a death sentence for the murder, finding the following statutory aggravating circumstances: the murder was committed while Petitioner was engaged in the commission of a rape; the murder was committed while Petitioner was engaged in the commission of an aggravated battery; and the murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture, depravity of mind, and an aggravated battery to the victim before death. *Id.* The trial court sentenced Petitioner to death. In addition to the death sentence, the trial court sentenced Petitioner to life imprisonment for the rape and 20 years for the aggravated battery. *Id.* at 375 n.1.

Petitioner filed a motion for a new trial on May 4, 1998 and amended the motion on September 30, 1998. *Id.* The trial court denied the motion for new trial on October 12, 1998. *Id.*

Petitioner filed an appeal and the Supreme Court of Georgia affirmed the conviction and sentence on July 6, 1999. *Id.* at 375-86. Petitioner filed a motion for reconsideration and this was denied on July 30, 1999.

Petitioner filed a Petition for Writ of Certiorari in the United States Supreme Court and the Court denied the Petition on February 22, 2000. ***Johnson v. Georgia***, 528 U.S. 1172 (2000).

Petitioner filed a Petition for Writ of Habeas Corpus on June 5, 2000 and an amended Petition on November 9, 2001. (R. at 2, p. 3-4). The Butts County Superior Court conducted an evidentiary hearing on June 24-26, 2002 and denied relief on all claims on January 7, 2004. (R. at 2, p. 4).

Petitioner filed an Application for Certificate of Probable Cause to Appeal in the Georgia Supreme Court and the Court denied the Application on July 11, 2005. The Court denied Petitioner's Motion for Reconsideration on September 19, 2005. (R. at 2, p. 4).

Petitioner filed a Petition for Certiorari in the United States Supreme Court and the Court denied the Petition on April 3, 2006. ***Johnson v. Terry***, 126 S. Ct. 1661 (2006). The United States Supreme Court also denied Petitioner's request for a rehearing on May 30, 2006. ***Johnson v. Terry***, 126 S. Ct. 2349 (2006).

Petitioner filed his Petition for Writ of Habeas Corpus by a Person in State Custody in this Court on June 7, 2006. (R. at 2). Petitioner has now filed a motion for discovery related to this Petition.

## II. STANDARDS GOVERNING DISCOVERY
## IN FEDERAL HABEAS CORPUS CASES

The Supreme Court has stated that "a habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of course." ***Bracy v. Gramley***, 520 U.S. 899, 904 (1997). First, a petitioner seeking discovery must demonstrate that he has been "reasonably diligent in trying to develop the factual record while in state court." ***Isaacs v. Head***, 300 F.3d 1232, 1249 (11th Cir. 2002); ***Crawford v. Head***, 311 F.3d 1288 (11th Cir. 2002).

Next, Rule 6(a) of the Rules Governing § 2254 Cases (hereinafter "Rule 6") provides that "[a] party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." The Supreme Court has explained that Rule 6(a) is meant to be consistent with *Harris v. Nelson*, 394 U.S. 286 (1969). *Bracy*, 520 U.S. at 909; *See also* Rule 6 Advisory Committee's Notes. Therefore, a petitioner has established "good cause" for discovery if "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Harris*, 394 U.S. at 299. A petitioner must set forth specific allegations of fact, as opposed to conclusory assertions, because Rule 6 does not authorize "fishing expeditions." *See Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994), *cert. denied*, 513 U.S. 1992 (1995).

Petitioner's request for financial assistance to pay for expert and investigative services necessary to complete discovery is governed by 18 U.S.C. § 3599 (f), which provides as follows:

> Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under paragraph (10).

*Id.*

### III. PETITIONER'S SPECIFIC REQUESTS FOR DISCOVERY AND AUTHORIZATION AND PAYMENT OF NECESSARY EXPERT AND INVESTIGATIVE SERVICES

A. FINGERPRINT AND HAIR SAMPLE

Eighteen (18) latent finger and palm prints were lifted from the interior and exterior of the

white Suburban sport utility vehicle ("SUV") in which Ms. Sizemore's body was found.[1] Petitioner explains that only one print[2] was suitable for fingerprint analysis and it did not match Petitioner, Ms. Sizemore, or any suspects in the Georgia and Florida computer databases. (Pet'r Dec. 14, 2006 Br., p. 6). The print was never submitted for comparison with the FBI Integrated Automated Fingerprint Identification System ("IAFIS"). Petitioner requests that this Court order such a comparison. According to Petitioner, "[a] match of the identifiable fingerprint obtained from Ms. Sizemore's vehicle with a print in the national database could identify an alternative suspect in the murder of Ms. Sizemore." (Pet'r Dec. 14, 2006 Br., p. 6).

In addition to the finger and palm prints, the police collected a hair sample from the rear seat floorboard of the white Suburban.[3] The GBI crime lab analysts determined that the hair was "head hair of possible negroid origin" and that it did not match Petitioner or Ms. Sizemore. (Pet'r Dec. 14, 2006 Br., p. 7). Petitioner requests that the Court order DNA tests of this hair sample and that the DNA profile of the hair be compared with DNA profiles stored in the FBI Combined DNA Index System ("CODIS").

Petitioner explains that these discovery requests are relevant to his claims of actual innocence and ineffective assistance of counsel.

---

[1] The record shows that the victim obtained possession of the SUV from her boyfriend less than one month prior to her murder. (Resp't Ex. 98, p. 4176, 4181).

[2] The only fingerprint that was suitable for analysis was found on the inside frame of the right rear passenger door of the vehicle. (Resp't Ex. 19, p. 55). The victim's body was not in the rear of the vehicle. Her body was in the right front passenger side floorboard. (Pet'r Ex. 1, Ex. D, p. 1).

[3] The interior of the vehicle had obviously not been recently cleaned and was littered with many other items that were collected as well: a money order receipt, a cellophane wrapper, bags of candy, white cotton, a plastic pill bottle, napkins, various cups, lids, straws, numerous toys, and numerous miscellaneous papers. (Pet'r Ex. 1, Ex. D).

The record shows that Petitioner made these same discovery requests during his state habeas corpus proceedings. (Resp't Ex. 64). The state habeas corpus court held as follows regarding these requests:

> Based upon what has been shown to the court, the victim was found inside her vehicle, a Chevrolet Suburban, which she did not own, and which she had only had possession of for a month or so.
> The presence of any other fingerprints of any other person on an item that any number of people have had access to after it was put on the road does not, without more, exculpate the defendant. Neither does the presence of a fiber of hair. The court notes that petitioner fails to mention any other item of evidence that gives rise to the presence of any person of the racial origin of the subject hair in the area of the car or with the victim on the night of her death.
> The court also notes that the defendant in his statement acknowledged that he left a local bar with the victim after they had drunk heavily, that they had sexual relations, that he remembered hitting her in the face, that there was blood and then he remembered waking up in a nearby field . . . .
> Speculation is what this court is presented with in these requests. The petitioner seeks to have a fingerprint analysis run to see if there is any other felon in the FBI database that it might match in the absence of any evidence putting any other person than the petitioner in the vehicle that night with the deceased victim. The same reasoning applies to the request to have the hair examined.
> The court therefore denies these motions.

(Resp't Ex. 76, p. 1-2).

Just as he did in the state habeas court, Petitioner hypothesizes that the fingerprint might match someone in the FBI's IAFIS; and the hair might match someone in the FBI's CODIS. However, "discovery cannot be ordered on the basis of pure hypothesis." *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006). The Eleventh Circuit recently reiterated that "good cause for discovery cannot arise from mere speculation." *Id*.

Unfortunately, this is all Petitioner presents to support his requests for discovery involving the fingerprint and hair. Petitioner speculates that these tests may lead to "another suspect." However, such speculation does not amount to good cause for discovery. Petitioner has not made specific allegations sufficient to show that he "may, if the facts are fully developed, be able to

demonstrate that he is entitled to relief." *Harris*, 394 U.S. at 299.

Petitioner states that when the state habeas court denied the requested testing, it did so "based on the erroneous finding that Petitioner had not presented any evidence that corroborated the materiality of the physical evidence." (Pet'r Dec. 14, 2006 Br., p. 20). Petitioner explains that he presented the testimony of an African-American male named Jake Dillard, who stated that he was with the victim and drove the SUV on the night of her death. However, the record shows that the state habeas court did review the testimony of Jake Dillard and found that it was "not credible." (Resp't Ex. 116, p. 24-25).[4] A federal district court must give deference to a state court's findings regarding credibility. *Baldwin v. Johnson*, 152 F.3d 1304, 1317 (11th Cir. 1998).

Given that Petitioner's discovery requests regarding the fingerprint and hair are speculative, his requests are denied.[5]

B. FIELD INVESTIGATION

Petitioner requests the Court to allow him "120 days in which to investigate and develop further evidence solely as to the guilt/innocence issue and related ineffectiveness claims." (Pet'r Dec. 14, 2006 Br., p. 12). Petitioner also requests the Court to authorize funds to cover this remaining field work. Petitioner explains that he could not develop this information at the state

---

[4] Petitioner presented evidence that the victim was allegedly at the house of Jake Dillard with Agnes Hicks and Shawn Keith on the night that she was murdered. However, the evidence presented at the hearing unequivocally established that the victim could not have been at Jake Dillard's house with Agnes Hicks on the night of her murder, because Agnes Hicks was incarcerated at the time. (Resp't Ex. 116, p. 24). Moreover, the state habeas court found that Jake Dillard's testimony (as well as that of Agnes Hicks and Shawn Keith) was undermined by his "criminal histor[y], the established and reliable time frames of Petitioner and the victim entering and leaving the bar, . . . and the[] claim that [the victim] was bleeding from the nose and smoking crack cocaine, which are directly contradicted by the autopsy report." (Resp't Ex. 116, p. 25).

[5] As the Court denies this testing, it also denies Petitioner's requests for funds to pay for the testing.

habeas level because the state court denied him the "necessary time to investigate and present his case." (Pet'r December 14, 2006 Br., p. 11).

The record in this case shows that Petitioner filed his state habeas corpus petition on June 2, 2000. (Resp't Ex. 55). On December 27, 2000, the state habeas court entered an order that required Petitioner to complete his discovery by June 18, 2001; and on April 11, 2001, the court entered an order requiring the completion of discovery by June 29, 2001. (Resp't Exs. 58, 60). On May 16, 2001, almost one year after he filed his petition, Petitioner requested a 90 day extension and the state habeas court granted this extension. (Resp't Exs. 62, 63, 69). Thereafter on September 27, 2001, Petitioner requested, and received, another three weeks to complete discovery. (Resp't Ex. 70). On October 11, 2001, Petitioner requested, and received, a "final extension of one week." (Resp't Ex. 71). On October 16, 2001, Petitioner requested, and received, an extension until November 19, 2001 to complete discovery. (Resp't Ex. 72). Petitioner explains in his brief that he continued to conduct discovery until May 2002; almost two years after he filed his original state habeas action. (Pet'r December 14, 2006 Br., p. 11).

On June 24, 25, and 26, 2002, the state habeas court held an evidentiary hearing. At this three day hearing, Petitioner presented five witnesses and 152 exhibits; including one deposition and numerous affidavits. (Resp't Exs. 81-109). The state habeas court issued its final order on January 5, 2004; more than three and one-half years after Petitioner filed his original state habeas corpus petition.

Petitioner has not shown "why the discovery that he seeks now is any different from the discovery that was available to him in state courts." *Isaacs*, 300 F.3d at 1250. As the Supreme Court stated in ***Williams v. Taylor***, 529 U.S. 420 (2000), "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue

in state proceedings." *Id.* at 437. In this case, Petitioner had years to conduct discovery regarding his claims while his action was pending at the state level. Under this set of facts, this Court must find that Petitioner did not act with due diligence. Therefore, his requests for additional field investigation and the funds to pay for such investigation must be denied. *See Isaacs*, 300 F.3d at 1249-50; *Crawford*, 300 F.3d at 1329.

### IV. CONCLUSION

For the reasons set forth above, Petitioner's Motion for Leave to Conduct Discovery and for Authorization and Payment of Necessary Expert and Investigative Expenses is **DENIED**. [6]

**SO ORDERED**, this 30th day of March, 2006.

W. LOUIS SANDS, JUDGE
UNITED STATES DISTRICT COURT

lnb

---

[6]Petitioner's request for a hearing regarding his Motion for Leave to Conduct Discovery and for Authorization and Payment of Necessary Expert and Investigative Expenses is **DENIED**.